**L. Wayne GRIDER and Nancy C. Grider, Plaintiffs–Respondents,**

v.

**Jeffrey J. TINGLE, et al., Defendants–Appellants.**

**No. SD 28753.**

Missouri Court of Appeals, Southern District, Division One.

Sept. 13, 2010.

Motion for Rehearing or Reconsideration and Transfer Denied Oct. 6, 2010.

Application for Transfer Denied Dec. 21, 2010.

Richard J. Rollings, Jr. of Camdenton, MO, for Plaintiffs–Respondents.

Lewis Z. Bridges of Osage Beach, MO, for Defendants–Appellants.

JEFFREY W. BATES, Judge.

After a bench trial, the trial court entered a judgment that quieted title to certain real estate, awarded nominal damages for trespass to the Griders and granted their requests for ejectment and injunctive relief. Jeffrey Tingle (Jeffrey) has appealed from the judgment and presents four points of alleged error.[1] Because none of Jeffrey's points have any merit, the judgment is affirmed.

■ The trial court's judgment is presumed correct, and Jeffrey bears the burden of proving it erroneous. *Surrey Condominium Ass'n, Inc. v. Webb,* 163 S.W.3d 531, 535 (Mo.App.2005). Appellate review in this court-tried case is governed by Rule 84.13(d).[2] This Court must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Strobl v. Lane,* 250 S.W.3d 843, 844 (Mo.App.2008). Substantial evidence is evidence which has probative force and from which the trier of fact could reasonably find the issues in harmony with its decision. *Harvard Properties, LLC v. City of Springfield,* 262 S.W.3d 278, 279 (Mo.App.2008). The phrase "weight of the evidence" means its weight in probative value, rather than the quantity or amount of evidence. *Nix v. Nix,* 862 S.W.2d 948, 951 (Mo.App.1993). The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. *Id.* "An appellate court exercises extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence and will do so only upon a firm belief that the judgment was wrong." *Simpson v. Strong,* 234 S.W.3d 567, 578 (Mo.App.2007).

■ On appeal, the evidence and all reasonable inferences derived therefrom are viewed in the light most favorable to the judgment. *Bacon v. Uhl,* 173 S.W.3d 390, 396 (Mo.App.2005). This Court disregards all contrary evidence and inferences. *Id.* The credibility of the witnesses and the weight to be given to their testimony is for

---

1. A number of persons mentioned in this opinion share the same surname. When referred to individually, such person's given name will be used for clarity.

2. All references to rules are to Missouri Court Rules (2009).

the trial court, which is free to believe none, part or all of the testimony of any witness. *Christian Health Care of Springfield West Park, Inc. v. Little*, 145 S.W.3d 44, 48 (Mo.App.2004). "We defer to the trial judge's superior opportunity to assess the witnesses' credibility." *Lee v. Hiler*, 141 S.W.3d 517, 520 (Mo.App.2004). In the case at bar, the court made a number of factual findings in the judgment. This Court considers all other factual issues to have been determined in accordance with the result reached. Rule 73.01(c). Our summary of the evidence presented at trial, which is set forth below, has been prepared in accordance with these principles.

This lawsuit involves a dispute about real property located at Lake of the Ozarks in Camden County, Missouri, in the Shawnee Bend No. 4 and View East subdivisions. The relevant portions of a subdivision survey are appended to this opinion to aid the reader's understanding of the following facts and case background.

The Lake of the Ozarks is a privately owned, man-made lake. Before the lake was created, the Union Electric Land and Development Company (Land Company) acquired ownership of large tracts of land that would form the lakebed and adjacent lakefront property. Land Company's holdings included all of the land located in Shawnee Bend No. 4 above and below the 662–foot contour line. The land below that contour line was conveyed to the Union Electric Light and Power Company (Power Company), but Land Company retained an easement which, in relevant part, is set out below:

> This deed is made, however, subject to the following easement reserved to and retained by [Land Company] in and to all lands herein conveyed to [Power Company], viz; [Land Company] for itself, its successors and assigns, hereby reserves an easement in the lands hereinbefore described and hereby conveyed, to use the surface of said lands whether submerged or not, for any and all purposes whatsoever, including the erection and maintenance of improvements thereon, provided such use will in no way interfere with the construction, operation and maintenance by [Power Company], its successors or assigns, of the said dam . . ., power plant and works appurtenant. . . .

Thereafter, the land above the 662–foot contour line was platted as Lot 4 in the Shawnee Bend No. 4 subdivision (hereinafter, Lot 4). In 1959, William and Joan Hamilton (collectively, the Hamiltons) became the owners of Lot 4. This tract contained approximately eight acres.

In 1977, the Hamiltons sold all of their lakefront property to Gerald and Kay Stonitsch (the Stonitsches). As shown on the attached survey, the two-acre lakefront tract of land located within the bold, black lines was conveyed to the Stonitsches by warranty deed. The deed stated that the conveyance was:

> Subject to the following described easement, to be retained by the grantors: Beginning at the Southeast corner of said Lot 4; thence run along said South line of said Lot 4 South 59 degrees 24′ West 247.9 feet; thence leaving said South line and run North 12 degrees 27′ East 41.5 feet; thence North 59 degrees 24′ East 229.0 feet to the 662 Contour line of the Lake of the Ozarks; thence run along said 662 Contour line in a Southerly direction 30.8 feet more or less, to the point of beginning.

The easement was located on two wooded slopes that came together to create a natural drainage area into the lake.

In August 1979, the Stonitsches recorded a plat that created the View East Subdivision (VES). This new subdivision con-

tained six lots. The Hamiltons' retained easement was located along the southern edge of VES lot 1 (hereinafter, Lot 1). It is identified as "EASEMENT OF REC-ORD" on the attached survey.[3]

William died in 1978 or 1979. Joy Horne–Jones (Horne–Jones) is the daughter of William and Joan. Jeffrey is Horne–Jones' son. His wife is Maria Tingle. At some point not disclosed by the record, the Joan M. Hamilton 1991 Revocable Trust (the Trust) appears to have acquired an interest in Lot 4.

In 1999, the Lisses owned Lot 1. In October of that year, Joan filed a lawsuit against the Lisses in the Circuit Court of Camden County, Missouri. The petition alleged, *inter alia*, that Joan had an easement over Lot 1 "for ingress to and from the Lake of the Ozarks" and that the Lisses' placement of trash, debris and a dog run cable on the easement had interfered with Joan's ability to use it. The suit was dismissed in April 2000 after the Lisses cleaned up the easement area. In June 2000, Joan and the Trust conveyed Lot 4, including the retained easement over Lot 1, to Jeffrey and Horne–Jones.

That same year, Wayne and Nancy Grider became interested in purchasing Lot 1. Wayne knew about the easement and inspected the property. The easement was "completely grown up." There was no evidence that the easement had ever been used by the Hamilton family to tie up a boat dock. Wayne saw nothing to indicate that the easement had been used for anything other than access to the lake. In

September 2000, the Griders became the owners of Lot 1.[4] The warranty deed conveying the property to them stated that it was "[s]ubject to all restrictions, reservations, conditions and easements of record and to all existing roads and power lines, whether of record or not." The Griders received a permit from AmerenUE (Ameren) to have a boat dock and to install a seawall on the submerged land below the 662–foot contour line.[5] The Barrows, who lived in a home on the lot immediately south of Lot 1, also had a boat dock.

Between 1977 and 2004, the easement property had been used by Hamilton family members and their guests to access the water for fishing or swimming. In addition, this group of individuals had used the easement five or six times each summer to launch and temporarily beach small rented boats. During this same 27–year time period, the owners of Lot 1, their family members and guests likewise had used the easement property for swimming, fishing, launching boats and jet skis and temporarily parking such watercraft on the sandy shore.

Fred and Teril Buck lived next door to the Barrows and south of the Griders' property. With the Griders' permission, the Bucks and other neighbors used the beach portion of the easement area to swim and to temporarily store and wash their jet skis, boats and trailers. In the fall of 2004, Fred encountered Jeffrey on the easement area. Jeffrey was holding a large map and a blueprint and said he was put-

**3.** As shown on the first attached subdivision survey, Shawnee Bend No. 4 encompassed all of the land from Niangua Road on the west to the 662–foot contour line on the east. This lot, which is identified by the large number 4 above the words "Hamilton Circle" on the survey, is what the Hamiltons purchased in 1959. This Lot 4 should not be confused with the smaller VES lot 4, which was platted after

the Stonitsches purchased all of the Hamiltons' lakefront property and created VES.

**4.** The Griders owned all of the shares of WLW Land Development Corp. The Lisses sold Lot 1 to the corporation, which reconveyed the lot to the Griders.

**5.** Ameren is the successor to Power Company.

ting in a boat dock. When Fred told Jeffrey that he could not put in the dock because the Griders had given other people permission to use the easement area, Jeffrey said he owned that property.

In late 2004, Jeffrey was attempting to refinance the loan on Lot 4. On December 31, 2004, Jeffrey and Horne–Jones, along with their respective spouses, conveyed Lot 4 to Jeffrey and Maria (collectively, the Tingles) by warranty deed. This conveyance included the retained easement over Lot 1. In order to obtain a loan, however, Jeffrey had to have lakefront property. He went to Legend Land Title and asked the owner, Teresa Sapp (Sapp), to prepare a warranty deed from Joan conveying a fee simple interest in the land encompassed by the easement to the Tingles. Sapp told Jeffrey that he already had an easement interest in the property, and the warranty deed would be no good to him. Sapp declined to prepare the deed. Jeffrey returned to the title company two more times and finally persuaded another employee to prepare the warranty deed for him. In January 2005, this deed was recorded. It purported to convey a fee simple interest in the land encompassed by the easement to the Tingles. The deed was executed by Joan individually and in her capacity as trustee of the Trust, even though neither grantor had any interest in Lot 4 that could be conveyed. This warranty deed created a cloud on the title to Lot 1.

The Tingles moved into a house located on Lot 4. Their house was directly above the Griders' house on Lot 1. Jeffrey decided that he wanted to have a boat dock, so he called Ameren to find out how to obtain a dock permit. Before receiving the permit, he went ahead and purchased a boat dock in late February 2005. On March 3, 2005, Jeffrey called Wayne and asked for

permission to tie the Tingles' boat dock to the Griders' dock. Wayne refused.

Shortly after this telephone call, the Tingles' dock was towed up between the Griders' dock and the Barrows' dock and placed against the shoreline on the easement property. The Tingles' dock was tied to the side of the Griders' dock. In addition, cables were run from the Tingles' dock to an anchor on the Griders' seawall and to the Barrows' property. The Tingles also began regularly trespassing on the Griders' property. They frequently drove vehicles over the Griders' driveway or yard to access the easement property. They walked in the Griders' yard and stood on their porch. They went inside the Griders' carport and used the outlet there to provide electricity for power tools. They built a structure described as a "martini deck" on the easement property. The martini deck was a platform surrounded by a railing, and it was large enough to hold a number of chairs. Stairs were built on the front and back sides of the platform. After the martini deck was built, vehicles could no longer access the lake via the easement area. Instead, vehicles had to drive over the Griders' yard or the Barrows' property to get to the water.

Ameren received Jeffrey's dock application on March 23, 2005. A copy of the January 2005 warranty deed was attached to the application. This deed made it appear that the Tingles were the fee simple owners of the land encompassed by the easement. Ameren relied on the documents that Jeffrey attached to his application in deciding whether to issue the permit. Ameren officials believed that the Tingles were the owners of the land to which their dock would be attached.

On March 25, 2005, the Griders' attorney sent a letter to the Tingles demanding that they stop trespassing on the Griders' property. The Tingles received the letter,

but their acts of trespass continued. In a letter to the Griders' attorney, the Tingles claimed to own the land encompassed by the easement.

On August 23, 2005, Ameren issued a dock permit to Jeffrey. The permit authorized the placement of a concrete pier on the lakebed to secure the ramp for the Tingles' dock. The permit stated, however, that placement of the dock could not "interfere with access to adjacent docks or other property. Disputes that may arise from placement of this [activity] shall be locally or legally resolved by the permittee...." Finally, the permit also said that "your attention is invited to general condition 'f' in said Appendix which states in part, that this permit does not convey any property rights, either in real estate or material, or any exclusive privileges, nor does it authorize any injury to property or invasion of rights of other persons." [6]

After receiving the permit, the Tingles installed a cement pier onto the lakebed and attached a 30-foot ramp to the pier and dock. Because of the placement of the dock, pier and ramp in relation to the shoreline, the beach area could no longer be effectively used for swimming, fishing, launching jet skis and boats, etc. After the attachment of the Tingles' dock to the Griders' seawall, a crack developed in the wall from top to bottom at the anchor point.

In an April 2005 letter, the Griders' attorney had demanded that the Tingles remove the cloud on the title to the Griders' property created by the January 2005 warranty deed. Although the Tingles received the letter, nothing was done. Additional letters demanding action were sent to the Tingles in May and June 2005, with the same results.

On September 14, 2005, the Griders filed a lawsuit in the Circuit Court of Camden County, Missouri, against the Tingles; Horne–Jones; and Joan, both individually and as trustee of the Trust. The petition contained counts for quiet title, ejectment, trespass, injunctive relief, slander of title and declaratory relief. On September 23, 2005, the Tingles finally recorded a quitclaim deed and release which stated that the Tingles were "the holder of an easement for access to the Lake of the Ozarks across the real property owned by [the Griders]...."

After a bench trial, the court entered a judgment that disposed of Counts I–IV in the following ways: [7]

*Count I—Quiet Title:* The court decided that the Griders held fee simple title to Lot 1 and that Horne–Jones and Joan had no interest in said property. The Griders held an easement appurtenant to Lot 1 below the 662–foot contour line which they could use for any and all purposes, including the erection and maintenance of improvements thereon, provided such use did not interfere with the construction, operation or maintenance of Bagnell Dam. The Griders' seawall was situated on a portion of this appurtenant easement. The Tingles held a nonexclusive easement for ingress and egress to the waters of the lake for swimming, boat launching and other transitory purposes. The court specifi-

6. The Appendix was attached to the permit. General Condition f states: "That this permit does not convey any property rights, either in real estate or material, or any exclusive privileges; and that it does not authorize any injury to property or invasion of rights or any infringement of Federal, State, or local laws or regulations, nor does it obviate the requirement to obtain State or local assent required by law for the activity authorized herein."

7. The judgment stated that Count V (slander of title) and Count VI (declaratory relief) were dismissed by the court.

cally decided that the easement "is not for the purpose of access to a boat dock or attaching thereto a boat dock, cables, or for the installation of any pier, deck or other permanent structure."

*Count II—Ejectment:* The court decided that the Tingles had no right to maintain the boat dock ramp and martini deck located on the Tingles' easement property or the cables attached to the Griders' seawall and property. Therefore, the Griders were entitled to ejectment in order to have these items removed.

*Count III—Trespass:* The court found that the Tingles had continually trespassed, by vehicle and by foot, on portions of the Griders' property not subject to the Tingles' easement. With respect to the easement property itself, the court decided that the Tingles' use of the easement for non-transitory purposes exceeded the scope of the easement and constituted trespass as well. The court found that such uses by the Tingles changed their transitory, non-exclusive easement for ingress and egress and precluded the Griders from reasonable joint use of the easement property. Therefore, the court decided the Griders were entitled to nominal damages of $1.00 for such trespasses.

*Count IV—Injunctive Relief:* The court found that the Griders were entitled to injunctive relief due to the Tingles' continuing trespasses. The Tingles were enjoined from attaching cables to the Griders' seawall or property and from maintaining the martini deck, boat dock, ramp or any other improvements on Lot 1. The Tingles also were enjoined from using their easement for any purpose other than ingress or egress to the Lake of the Ozarks.

Only Jeffrey has appealed from the judgment. Additional facts necessary to the disposition of the case are included below as we address Jeffrey's four points of error.

### Point I

■ In Jeffrey's first point, he contends the trial court erred by ordering the removal of the Tingles' boat dock, ramp and piers because he and the Griders share in common the appurtenant easement granted by Power Company that authorizes the use of the surface of the lakebed for any and all purposes, including the erection and maintenance of improvements. Jeffrey argues that he has the right to use this common, appurtenant lakebed easement so long as his use does not interfere with the activities or operation of the Power Company. Jeffrey also argues that the trial court's ruling was beyond the scope of the pleadings. For the reasons discussed below, neither argument has merit.

■ Generally, there must be a dominant and a servient estate in order to create an easement. *Loumar Development Co. v. Redel,* 369 S.W.2d 252, 257 (Mo.1963); *Denning v. Manley,* 610 S.W.2d 51, 56 (Mo.App.1980).[8] When Land Company conveyed the real estate below the 662–foot contour line to Power Company, Land Company reserved an easement to use the surface of said lands for any and all purposes that did not interfere with Power Company's construction, operation or maintenance of the dam, power plant or appurtenant works. Thus, Land Company's undivided block of land above the 662–foot contour line and contiguous to the lakebed constituted the dominant estate benefited by the appurtenant

---

8. This principle does not apply to easements in gross. *See, e.g., Wallace v. Snider,* 134

S.W.3d 118, 119 (Mo.App.2004); *Gowen v. Cote,* 875 S.W.2d 637, 640 (Mo.App.1994).

easement. *See Paul v. Jackson,* 910 S.W.2d 286, 287–88 (Mo.App.1995). Power Company's contiguous land below the 662–foot contour line constituted the servient estate.

When the eight-acre tract of Land Company's real estate above the 662–foot contour line was platted and sold as Lot 4, that land was still contiguous to the lakebed and became one of the dominant estates benefited by the appurtenant easement. *See Paul,* 910 S.W.2d at 288. As a consequence of this conveyance, the land located at a higher elevation than Lot 4 was no longer contiguous to the lakebed. The conveyance severed the higher-elevation land from the lakefront tract that was benefited by the appurtenant lakebed easement. *See Turnbull v. Car Wash Specialties, LLC,* 272 S.W.3d 871, 874 n. 2 (Mo.App.2008) (easements may be terminated based upon alterations in the dominant estate); RESTATEMENT (FIRST) OF THE LAW OF PROPERTY § 488 cmt. d (1944) (noting that "[a]n easement may be so created as to benefit the one in whose favor it was created as the possessor of a given tract of land while giving him no benefit as the possessor of another and different tract").

In 1977, the Hamiltons sold all of the lakefront property in Lot 4 to the Stonitsches. Once again, the identity of the land that constituted the dominant estate benefited by the appurtenant lakebed easement was changed by that sale and conveyance. Insofar as relevant here, the Stonitsches' two-acre tract contiguous to the lakebed became a dominant estate benefited by the appurtenant lakebed easement.[9] Because the six-acre tract retained by the Hamiltons was no longer contiguous

to the lakebed, their retained property was no longer part of a dominant estate benefited by the appurtenant easement. After that transfer of ownership, the Hamiltons' easement rights were limited to the express easement contained in the warranty deed conveying the property to the Stonitsches.[10]

Citing *Karches v. Adolph Inv. Corp.,* 429 S.W.2d 788 (Mo.App.1968), Jeffrey argues that the Hamilton's sale of all of the lakefront property in Lot 4 did not extinguish their right to share the appurtenant lakebed easement with other lakefront property owners. That case does not support Jeffrey's argument.

In *Karches,* the Schuermann Company (Schuermann) developed the 29–lot Lake Sherwood subdivision. Subdivision lot owners were able to reach Lackland Road via East and West Sherwood Drives. These two north-south private roads abutted lots on the east and west sides of the subdivision and joined Lackland Road on the north. The recorded subdivision plat reserved to Schuermann the right to use East and West Sherwood Drives. *Id.* at 789–90. Schuermann sold 34 acres of land just south of the subdivision to the Adolph Investment Company (AIC). The AIC property abutted both East and West Sherwood Drives. *Id.* at 789–91. AIC filed a plat to subdivide its land into 42 lots, all of which would access Lackland Road via East and West Sherwood Drives. *Id.* at 789. The Lake Sherwood subdivision trustees filed suit to obtain a declaratory judgment and injunctive relief to limit the rights of AIC and its assignees to use East and West Sherwood Drives. *Id.* After the trial court ruled in favor of AIC,

9. We use the phrase "a dominant estate" because there were many parcels of property contiguous to the 662–foot contour line that were benefited by the appurtenant lakebed easement.

10. The nature of the use authorized by that express easement is the subject of Jeffrey's third point on appeal and will not be discussed further here.

the trustees appealed. The appellate court noted that AIC's property constituted the dominant estate benefited by the appurtenant easement relating to the use of East and West Sherwood Drives. *Id.* at 791. In upholding the trial court's judgment, the appellate court relied upon the principle that, except as limited by the terms of transfer or the manner or terms of the creation of an appurtenant easement, those who succeed to possession of a subdivided portion of a dominant estate also succeed to the privileges of using the servient estate as authorized by the easement. *Id.*

In *Karches*, the land purchased by AIC abutted both East and West Sherwood Drives. Thus, AIC's land was the dominant estate that was benefited by an appurtenant easement on contiguous land used as a roadway. The division of AIC's land into smaller parcels did not sever those parcels from the dominant estate. In the case at bar, however, the Hamiltons' sale of all of the lakefront property in Lot 4 to the Stonitsches did sever the remaining six acres from the dominant estate benefited by the appurtenant lakebed easement on contiguous land. Therefore, *Karches* has no application here.[11] Jeffrey's first argument is based upon the premise that the portion of Lot 4 which he owns is a dominant estate still benefited by the appurtenant lakebed easement. Be-

cause that premise is incorrect, the argument fails.

■ Jeffrey's second argument is that the trial court's ruling was beyond the scope of the pleadings. We find no merit in this assertion. The Griders' petition contained counts for quiet title, ejectment, trespass, injunctive relief, slander of title and declaratory relief. The evidence presented at trial was relevant to the issues raised by those theories of recovery. In particular, much of the focus of the trial was on whether the Tingles' conduct exceeded the scope of any easement rights which they did have. If an easement user exceeds his rights, either in the extent or manner of his use, he is guilty of trespass to the extent of the unauthorized use. *Maasen v. Shaw*, 133 S.W.3d 514, 520 (Mo. App.2004); *Macios v. Hensley*, 886 S.W.2d 749, 752 (Mo.App.1994). If the actions outside the scope of the easement are capable of repetition, the servient owner may be awarded injunctive relief. *Maasen*, 133 S.W.3d at 520. In the judgment, the court dismissed the counts dealing with slander of title and declaratory relief. The court granted the Griders' requests for relief with respect to the quiet title, ejectment, trespass and injunctive relief counts. Based upon our review of the record, there is no indication that the trial court granted any relief to the Griders based upon a theory that was outside of the pleadings.[12] Point I is denied.

11. The principle in *Karches* would apply to purchasers like the Griders, who purchased VES Lot 1 after the Stonitsches subdivided their land. Lot 1 became its own dominant estate benefited by the appurtenant lakebed easement on land contiguous to the Griders' lot.

12. Jeffrey's brief identifies only two instances in which he objected to testimony as beyond the scope of the pleadings. The first instance involved an objection to Teril Buck's testimony about what use the Griders, their relatives and friends made of the easement property.

That testimony was relevant to the issue of the purpose and scope of the easement retained by the Hamiltons, as well as whether or not the easement was intended to be exclusive. The second instance involved an objection to a question about easement language contained in Ex. 49. This exhibit was an index of all of the deeds in the chain of title to Lot 1 from the date the parcel of property encompassing Lot 1 was acquired by Power Company. This exhibit contained the same appurtenant lakebed easement language in the deed from Land Company to Power Company.

## Point II

In Jeffrey's second point, he contends the trial court erred by granting relief to the Griders because, "assuming for the purpose of argument that issues of nuisance were before the trial court, [the Griders] failed to show any substantial interference with their property rights which is a required element of a cause of action for nuisance." After reviewing the transcript, we find no indication that the trial court was presented with evidence bearing only on a nuisance theory of recovery, rather than one of the other theories pled in the petition. In the judgment, the trial court granted the Griders' requests for relief based upon the quiet title, ejectment, trespass and injunctive relief counts in the petition. There is nothing in the record before this Court to indicate that the Griders sought relief based upon a nuisance theory or that the trial court granted any relief based upon such a theory. Because the record fails to support Jeffrey's contention, Point II is denied.

## Point III

■ In Jeffrey's third point, he contends the trial court erred by ordering the removal of the Tingles' boat dock, ramp and piers because he holds an exclusive easement over the Griders' property. According to Jeffrey, this exclusive easement authorized him to locate and access a boat dock in conjunction with the easement, and his actions did not exceed the scope of his

easement. We find no merit in this argument.

■ We first address whether or not the easement reserved by the Hamiltons in the 1977 warranty deed is exclusive. In order for the easement to be exclusive, the language used to create it must refer "to the exclusion of the servient tenement from participation in the rights granted to the dominant owner." *Maasen v. Shaw*, 133 S.W.3d 514, 518 (Mo.App.2004); *see Weis v. Miller*, 805 S.W.2d 683, 684 (Mo. App.1990) (language in subdivision plat stating that two streets were reserved "for the exclusive use and benefit of the owners of lots in the subdivision" created an exclusive easement); *Robert Jackson Real Estate Co., Inc. v. James*, 755 S.W.2d 343, 346 (Mo.App.1988) (holding that the easement at issue was non-exclusive because neither the language used in the deed that created the original easement nor any subsequent conveyances provided for exclusive use by the easement holders).[13]

Neither the 1977 warranty deed conveying VES to the Stonitsches nor the 2000 warranty deed conveying Lot 1 to the Griders contain any language excluding the owner of the servient estate from participating in the rights granted to the dominant owner. Therefore, the trial court correctly decided that the Tingles' easement was non-exclusive. As the servient owners, the Griders retained the privilege

---

This deed, which was identified as Ex. 37, was admitted by stipulation of the parties at the beginning of the trial. When Jeffrey's second objection was made, both Ex. 37 and Ex. 49 were in evidence with no objection being raised to the admission of either one. Therefore, Jeffrey waived any claim of error he may have had with respect to the appurtenant lakebed easement language contained in Ex. 37 or Ex. 49. *Dorman v. State Bd. of Registration for Healing Arts*, 62 S.W.3d 446, 454 (Mo.App.2001).

13. The holdings in these Missouri cases are consistent with the general rule recited in this secondary authority: "Absent an express provision in a grant or reservation, an easement is not an exclusive interest in the burdened land. The servient owner retains all rights in the property, subject only to the easement." (Footnote omitted.) Jon W. Bruce & James W. Ely, Jr., THE LAW OF EASEMENTS AND LICENSES IN LAND § 8:20 (West 2001).

of sharing the benefits conferred by the easement. *Maasen*, 133 S.W.3d at 518.

We next address what benefits the Tingles' easement actually conferred. In interpreting the meaning of an easement, the intent of the parties is controlling. *Gowen v. Cote*, 875 S.W.2d 637, 641 (Mo.App.1994). When there is doubt as to the meaning, surrounding circumstances may be considered. *Id.* The language used in the 1977 warranty deed from the Hamiltons to the Stonitsches did not specify either the purpose of, or the uses for, the easement. Looking solely at the language of the deed, it is impossible to determine whether the easement was intended for ingress and egress, parking, drainage or some other purpose. The omission of any specific purposes or uses rendered the conveyance incomplete or ambiguous on its face. *Maasen*, 133 S.W.3d at 519. Therefore, it was appropriate for the trial court to consider extrinsic evidence to determine the parties' intent. *Id.*

Although Joan was a party to this action, she did not testify. Therefore, the trial court was not presented with any testimony from her about the purpose for which the Hamiltons retained the easement. *Cf. Hoelscher v. Simmerock*, 921 S.W.2d 676, 678 (Mo.App.1996) (grantor of easements testified that he intended to give the grantees an easement for lake access and another easement to maintain a boat dock). There was, however, abundant circumstantial evidence bearing on that issue for the trial court to consider. Between 1977 and 2004, the easement property had been used by Hamilton family members and their guests to access the water for fishing or swimming. In addition, this group of individuals had used the easement five or six times each summer to launch and temporarily beach small rented boats. During this same 27–year time period, the owners of Lot 1, their family

members and guests likewise had used the easement property for swimming, fishing, launching boats and jet skis and temporarily parking such watercraft on the sandy shore. When the Griders inspected Lot 1 prior to buying the property, the easement was completely overgrown. It appeared to Wayne that the easement property had not been used for anything other than obtaining access to the lake. In Jeffrey's testimony, he conceded that he was asking the court to deny the Griders the right to jointly use the easement property, even though such joint use had been occurring since the easement was created.

The court also was presented with evidence concerning the 1999 lawsuit Joan filed against the then-owners of Lot 1. Joan's petition stated that the easement was used for "ingress to and from the Lake of the Ozarks" and that the defendants were interfering with such use. This was strong circumstantial evidence of what the Hamiltons, as grantors, intended when they reserved the easement in the 1977 warranty deed. In addition, the deed of release executed by the Tingles and recorded in September 2005 acknowledged that the Tingles were the holders "of an easement for access to the Lake of the Ozarks across the real property owned by [the Griders]...." Finally, Jeffrey presented no evidence that the easement property had ever been used for boat dock purposes before he became the owner of Lot 4. He did not claim the right to use the easement property for that purpose until 2004. When he did so, he based that claim upon the false assertion that the Tingles owned the property encompassed by the easement. One such example occurred during Jeffrey's conversations with Fred Buck in 2004. Another example occurred in 2005 when Jeffrey obtained a warranty deed purporting to convey fee simple title to the easement property to the Tingles.

That deed was executed by Joan individually and in her capacity as trustee of the Trust, even though neither grantor had any interest in Lot 4 that could be conveyed to the Tingles. When Jeffrey applied to Ameren for a boat dock permit, a copy of the January 2005 warranty deed was attached to the application. This deed made it appear that the Tingles were the fee simple owners of the land encompassed by the easement. Ameren relied on the documents that Jeffrey attached to his application in deciding whether to issue the permit. Ameren officials believed that the Tingles were the owners of the land to which their dock would be attached. In short, Jeffrey's actions convincingly demonstrated that he was not relying upon the easement as the basis for his claim that he was entitled to put a boat dock on the lake.

After considering all of the foregoing evidence, the trial court determined that the Tingles held a non-exclusive easement for ingress and egress to the waters of the lake for swimming, boat launching and other transitory purposes. That factual finding is supported by substantial evidence. *See Maasen*, 133 S.W.3d at 519. As noted above, the Tingles' easement was non-exclusive. The Griders, as owners of the servient estate, retained the privilege of sharing the benefits conferred by the easement. *Id.* at 518. Therefore, they retained the privilege of using the easement property for such transitory purposes as launching boats and jet skis, temporarily parking such watercraft on the shoreline, swimming, boating and fishing. This was the same use the Griders and their predecessors in title had made of the easement property for over 25 years. In addition, the Griders retained the rights of full dominion and use of the easement property for any other purposes that did not impede the Tingles' rights of ingress and egress. *Southern Star Central Gas Pipeline, Inc.*

*v. Murray*, 190 S.W.3d 423, 430 (Mo.App. 2006).

■ The court also decided that the easement "is not for the purpose of access to a boat dock or attaching thereto a boat dock, cables or for the installation of any pier, deck or other permanent structure." We agree. An easement for ingress and egress provides a right of passage and allows the owner of the dominant estate unlimited reasonable use for that purpose. *Bedard v. Scherrer*, 221 S.W.3d 425, 429–30 (Mo.App.2006); *Maasen*, 133 S.W.3d at 519. Such an easement does not confer the right to place and access a boat dock, attach the dock to the shore using cables or the install piers, ramps or other structures. *See Macios v. Hensley*, 886 S.W.2d 749, 752 (Mo.App.1994).

In *Macios*, the plaintiffs had an easement for ingress and egress to the lake bed and lake. They argued that this easement authorized them to place and access a boat dock on the surface of the water abutting the defendants' property. The trial court did not agree. *Id.* at 751. On appeal, that ruling was affirmed. The appellate court held that the plaintiffs had an easement for ingress and egress to the lake, which included the right to use the easement to launch boats. *Id.* at 752. That easement, however, did not authorize the plaintiffs to place and access a boat dock on the lake. The court explained that the plaintiffs did not acquire the easement for docking purposes and that docking boats was a different quality of use than entering and leaving the water. *Id.* "The one involves going across land in a transitory manner; the other involves placing an obstruction on the land." *Id.* The court also noted that "[t]he evidence established that the plaintiffs' dock and boat affixed thereto created and imposed a substantial burden on the servient estate making it very difficult for the defendants to use

their land and dock to access the lake." *Id.*

We reach the same conclusion here. The Tingles' easement for ingress and egress did not authorize them to place a boat dock on the surface of the lake, access that dock or install a concrete pier and ramp to the dock. These actions exceeded the scope of their easement and created a new and substantial burden on the Griders' servient estate. Because of the placement of the dock, pier and ramp in relation to the shoreline, the Griders could no longer effectively use the beach area for launching jet skis and boats, swimming or fishing. The attachment of the Tingles' dock to the Griders' seawall also damaged that structure. These actions by the Tingles constituted trespass, as the trial court decided, and entitled them to injunctive relief. *Macios,* 886 S.W.2d at 752.

Jeffrey argues that *Hoelscher v. Simmerock,* 921 S.W.2d 676 (Mo.App.1996), supports his assertion that his actions were within the scope of the easement. After reviewing that decision, however, we find it to be factually distinguishable.

In *Hoelscher,* the Bleckes owned two lots at the Lake of the Ozarks. Lot 62 was a first-tier lot with approximately 50 feet of lake frontage. Lot 63 was a second-tier lot with no direct access to the lake. It was above and behind Lot 62. In 1988, the Bleckes sold part of Lot 63 to the Simmerocks. The deed granted the Simmerocks three easements. The first easement was for ingress and egress to Lot 63 and the parking of motor vehicles. The second easement, which was not located on Lot 62, granted the Simmerocks access to the lake (lake access easement). The Simmerocks used a series of wooden steps over this easement to access the water. The third easement was located on Lot 62. It was described as being along the water's edge and extending an additional 15

feet from the water's edge corner of the lake access easement. When the Simmerocks bought Lot 63, a boat dock was already floating on the water abutting Lot 62. In 1989, the Bleckes sold Lot 62 to the Hoelschers. The deed conveying Lot 62 stated that it was subject to easements of record. A few months later, the Simmerocks replaced the dock and installed a ramp that attached to the shoreline on Lot 62. In 1994, the Hoelschers brought suit to have the third easement extinguished and to obtain damages from the Simmerocks for trespass because they had constructed and used the boat dock. *Id.* at 677–78. At trial, Mr. Blecke and Ms. Simmerock gave the following testimony to establish the location and purpose for the third easement:

> Mr. Blecke testified that he intended to give the Simmerocks a ten-foot easement "to get them to the lake" and a fifteen-foot easement "for a boat dock." He intended the third easement to be located in the northeast corner of Lot 62, running fifteen feet along the shoreline. The purpose of this third easement was to give the Simmerocks "room to put a dock in front of this 10 foot down to the lake." Ms. Simmerock testified that she believed the deed gave her "a 10-foot easement going to the lake, then an extension to the left 15 more." She believed the purpose of the third easement was to allow her room for a boat dock.

*Id.* at 678. The trial court found that the Simmerocks were entitled to a 15-foot easement across the shoreline of the Hoelschers' property, beginning at the corner of the lake access easement. The Hoelschers appealed.

The western district of this Court affirmed the trial court's judgment. The appellate court decided that the trial

court's decision was supported by the evidence:

> [T]he location of the third easement was described in reference to the lake access easement. The lake access easement is a ten-foot right-of-way running from the Simmerocks' property to the shoreline. Its purpose is to give the Simmerocks access to the lake, and does not cross the Hoelschers' property. The third easement was then created to give the Simmerocks room to maintain a boat dock. According to the deed, the third easement extends fifteen feet along the shoreline of Lot 62, starting from the waters edge corner of the lake access easement. The testimony of Mr. Blecke, the grantor of the easements, and Ms. Simmerock, a grantee, reinforce the language of the deed. Mr. Blecke testified that he intended to give the owner of Lot 63 an easement for access to the lake and another easement to maintain a boat dock fifteen feet across the property of Lot 62, leaving the owner of Lot 62 thirty-five feet for his own dock. Ms. Simmerock similarly testified that she believed the deed granted her a fifteen-foot easement along the shoreline of Lot 62 for the maintenance of a boat dock. The intentions of the parties are supported by the usage of the easement. A boat dock was in place in front of the lake access easement when Mr. Blecke conveyed part of Lot 63 to the Simmerocks. The Simmerocks used this dock for approximately a year and then replaced it with one which was slightly larger. Both docks were used by the Simmerocks in conjunction with the lake access easement.

*Id.* at 679. Because the grant creating the third easement did not declare a specific purpose for the easement, it was appropriate for the trial court to consider how that easement had been previously used. *Id.* The appellate court concluded by stating:

> [T]he deed grants the third easement in general terms and the Simmerocks are entitled to reasonable use of it. *Certainly, a natural and reasonable use of an easement along the shoreline of a lake includes the attachment of a boat dock.* The Simmerocks' usage of the third easement as such supports this characterization.

*Id.* at 680 (italics added).

Jeffrey argues that the italicized language in *Hoelscher* means that the Tingles are entitled to use their ingress and egress easement for the attachment of a boat dock. We disagree. Jeffrey ignores the fact that, in *Hoelscher*, the Simmerocks had a completely separate easement for ingress and egress to the lake over property other than Lot 62. *Hoelscher*, 921 S.W.2d at 679. There was evidence in *Hoelscher* that the third easement was specifically intended to be used for the purpose of allowing the Simmerocks to attach a boat dock to the shoreline on Lot 62. *Id.* at 678. Moreover, there was evidence that the easement had been used for that purpose from the inception of the third easement's creation. *Id.* No such evidence of intent or usage was presented in the case at bar. Instead, the circumstantial evidence before the trial court supported the inference that the Tingles' easement was intended only for the purpose of securing ingress and egress to the lake and related, transitory uses such as swimming, launching boats, etc. Thus, *Hoelscher* does not support Jeffrey's argument. Point III is denied.

### Point IV

■ In Jeffrey's fourth point, he contends again that the relief granted by the trial court was beyond the scope of the pleadings. Jeffrey argues that the trial court's order that the boat dock, ramp and

pier be removed is beyond the scope of the pleadings because they are located on the lakebed easement abutting Lot 1.[14] We disagree.

■ Jeffrey argues that the Griders' petition did not make any allegations regarding improvements located beyond the boundaries of that lot. Assuming *arguendo* that is true, the issue of who was authorized to use the appurtenant lakebed easement was tried by implied consent. At the outset of the trial, the deed from Land Company to Power Company containing the appurtenant lakebed easement language was admitted by stipulation of the parties. If that evidence was beyond the scope of the pleadings, Jeffrey was obligated to object to the admission of Ex. 37. He did not do so. Failure to timely object to evidence beyond the scope of the pleadings constitutes implied consent for a determination of the issues raised. *Schuchmann v. Air Services Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 236 (Mo.App.2006).

■ Jeffrey ignores the admission of this exhibit and instead focuses on the later admission of Ex. 49. This exhibit was a voluminous document that included the Land Company's deed to Power Company. This copy of the deed also contained the appurtenant lakebed easement language. Jeffrey claims he objected to evidence beyond the scope of the pleadings when Ex. 49 was introduced. The record does not support that assertion. When Ex. 49 was offered in evidence, Jeffrey's counsel stated that he had "no objection" to its admission. This resulted in a waiver of any claim of error Jeffrey may have had

concerning this exhibit. *Dorman v. State Bd. of Registration for Healing Arts*, 62 S.W.3d 446, 454 (Mo.App.2001). The objection made by Jeffrey's counsel was only asserted when the Griders' counsel began to question the witness about the specific appurtenant lakebed easement language in the exhibit. At that point, the exhibit already had been admitted. When a written document is admitted in evidence, the entire contents of the document are admitted in the absence of specific objections to admit it only on a partial basis. *Rob–Lee Corp. v. Cushman*, 727 S.W.2d 455, 457 (Mo.App.1987). In addition, the appurtenant lakebed easement language in Ex. 49 was cumulative of Ex. 37, which had been admitted by stipulation.

■ We also note that Jeffrey chose to introduce his own evidence on this subject. During the Griders' case-in-chief, the court took a recess. When the recess ended, Jeffrey was permitted to call Joe Daley as a witness out of order. Daley was a senior real estate representative for Ameren. Jeffrey's counsel asked Daley who owned the lakebed of Lake of the Ozarks. When the Griders' counsel objected, Jeffrey's counsel reminded the court that Ex. 37, the deed from Land Company to Power Company, had already been admitted in evidence. Thus, it is evident that both parties sought to have the trial court determine what rights they had to use the lakebed that was subject to the appurtenant easement reserved by Land Company. "It is settled law that a party may not complain on appeal of an alleged error in which he joined, acquiesced or invited by his conduct at trial." *Barnes v. Morris*

14. Jeffrey cites *Denning v. Manley*, 610 S.W.2d 51 (Mo.App.1980), to support his argument. In *Denning*, the appellants argued that the trial court's judgment required them to remove a concrete seawall. *Id.* at 57. The appellate court rejected that argument because "the disposition of the seawall, while perhaps implicit in the plaintiff lot owners' original cause, is not addressed in the judgment, and we express no opinion thereon." *Id.* at 58. We fail to discern how this case advances Jeffrey's argument.

*Oil Co.,* 263 S.W.3d 697, 702 (Mo.App. 2008). The position Jeffrey took at trial has been carried forward on appeal. Relying upon Ex. 37, Jeffrey argues in his brief that he is the holder of "an easement to use the bed of the Lake of the Ozarks for all purposes including the location of improvements as long as it does not interfere with the activities or operation of the dam, by [Power Company] or its successors." Point IV is denied.

The judgment of the trial court is affirmed.

BARNEY, J., and SCOTT, P.J., Concur.

## APPENDIX