SURREY CONDOMINIUM
ASSOCIATION, INC.,
Plaintiff–Appellant,

v.

Imogene WEBB, Individually and as
Personal Representative of Delbert
Webb, Deceased, Defendant–Respon-
dent.

No. 25986.

Missouri Court of Appeals,
Southern District,
Division Two.

May 5, 2005.

Richard L. Schnake, Springfield, MO, for Appellant.

David L. Smith, Branson, MO,. for Respondent.

JEFFREY W. BATES, Chief Judge.

Surrey Condominium Association, Inc. ("the Association") sued Imogene and Delbert Webb ("the Webbs") to recover unpaid maintenance fees for the years 2001 and 2002 in the amount of $9,700 and to enforce an assessment lien against their condominium.[1] Delbert was deceased when the Association's petition was filed, so Imogene was substituted for Delbert in her capacity as the personal representative of Delbert's estate. To simplify matters, we will refer to both parties-defendant as Imogene.

After a bench trial, the court decided the Association's maintenance fees and the assessment lien were void and unenforceable. Judgment was entered in Imogene's favor, and the lien was removed from her property. The Association has appealed. It argues the trial court's ruling permits Imogene to avoid paying her fair share of common expenses. We disagree. The Association sued Imogene to recover unpaid maintenance expenses. Because the Declaration of Condominium ("Declaration") does not authorize the assessment of maintenance fees against a unit owner like Imogene, we affirm.

The Surrey condominium project was developed by Surrey Vacation Resorts, Inc., and consisted of 28 units. The Declaration was filed with the Taney County Recorder of Deeds on May 4, 1993. This document recognizes and describes two forms of condominium ownership: (1) unit ownership; and (2) interval ownership. Thus, a potential buyer interested in one of the condominiums could buy a whole unit and become a "Unit Owner," or buy one or more unit weeks of ownership in a particular unit and become a "Unit Week Purchaser."

The difference between these forms of ownership is important because it affects the type of assessments that can be levied against each class of owners pursuant to the Declaration. Article VII of the Declaration states that both Unit Owners and Unit Week Purchasers must pay their pro rata share of the common expenses of The Surrey Condominium. This provision also states: "The Unit Week Purchaser's share of the Common Expenses in his Unit shall be further broken down in accordance with his percentage of ownership interest in the Unit, and shall be assessed as a part of the maintenance fee."[2] Article VIII of the

---

1. The use of given names, rather than surnames, is for the sake of clarity; no disrespect is intended.

2. Common expenses are defined in Article I, § 5, to include: "(1) all expenses incident to the administration, maintenance, repair and replacement of the Common Areas, the exterior of all Units and payment of insurance premiums, including fire and casualty insurance on all Units and the Common Areas, and public liability insurance, after excluding therefrom any and all expenses which are the responsibility of a Unit Owner or Unit Week Purchaser; and (2) expenses determined by the Association to be common expenses." These common expenses are allocated based upon the fractional relationship which a certain unit's total interior square footage bears to the entire interior square footage of all units comprising the condominium project.

Declaration is entitled, "Maintenance Fee for Units Committed to Interval Ownership." It states, in pertinent part, as follows:

In order to fund the Common Expenses of The Surrey Condominium and its Common Areas, all Unit Week Purchasers shall pay a "maintenance fee" which includes, but is not limited to, the following:

The particular Unit Week Purchaser's share of Common Expenses;

Repair and upkeep of Units for normal wear and tear (example—repainting interior walls);

Repair and replacement of furniture, fixtures, appliances, carpeting and utensils, and reserves necessary therefor;

Casualty and/or liability insurance on the contents of the Unit and the interior of the Unit;

Personal property, real estate, and any other applicable taxes;

Charges for membership in an exchange organization known as Resort Condominiums International or its successor;

Any other expenses incurred in the normal operation and maintenance of the Unit which cannot be attributed to a particular Unit Week Purchaser.

Said fee shall be prorated among all Unit Week Purchasers upon terms and conditions which will reflect a fair and equitable allocation of expenses of the regime as between Unit Week Purchasers. The maintenance fee and prorata allocation thereof shall be assessed and collected by the Association or its designated agent pursuant to a Management Agreement as provided in Article XXII herein. . . .

Article XIV of the Declaration is entitled "Assessments" and states, in pertinent part, as follows:

The Association, through its Board of Directors, shall have the power to fix, determine, assess and levy from time to time the sums, assessments and maintenance fees necessary and adequate to provide for the Common Expenses of The Surrey Condominium. The procedure for the determination of all such assessments shall be as set forth in the Bylaws of the Association and this Declaration, and the Exhibits attached hereto.

The Common Expenses shall be assessed against each Unit Owner as provided for in Article VII of this Declaration. In the case of a Unit committed to interval ownership the maintenance fee shall be assessed against each Unit Week Purchaser as provided for in Article VIII of this Declaration.

In May 1993, the Webbs bought Unit No. 1 at the condominium project for $105,000. This unit was the first one sold in that development. The Webbs were Unit Owners because they purchased the whole ownership interest in Unit No. 1. As Unit Owners, the Webbs were responsible for maintaining and repairing the interior of their unit. They also paid their own utilities, property taxes and insurance on their belongings inside the unit.

From May 1993 through the end of 1999, the Webbs paid an assessment of $60 per month for common area maintenance. On January 1, 2000, this fee was raised to $400 per month. Imogene thought the fee had increased too much, and she refused to pay it.[3] She spoke to a Surrey representative about the matter and was told that her fee increased because her unit had been recarpeted and refurnished. That statement, however, was in error because only units committed to interval

3. Delbert had died on November 14, 1999.

ownership had been refurbished.[4] Imogene offered to pay the $60 per month she had been paying since 1993, but the Association refused to accept it.

The parties were unable to resolve the issue, and in January 2002, the Association filed a "Statement of Assessment Lien" with the Taney County Recorder's Office. This lien notice stated, in pertinent part, that:

[The Association] ... with a view towards availing itself of the benefit of the Declaration of Condominium for the Surrey Condominium ... and in particular, the provisions of Article VIII, for the establishment of maintenance fees, and the provisions of Article XIV, for the assessment, and establishment of a lien for the unpaid and assessed maintenance fees, hereby files an account of those assessments being due in the amount of $4,850.00 for assessments and fees with reference to and provided for, and under the provisions of the Declaration of Condominium for Surrey Condominium, for [Unit No. 1 owned by the Webbs].

In April 2002, the Association sued Imogene to recover unpaid maintenance fees for the years 2001 and 2002 in the amount of $9,700. This sum was comprised of two years' unpaid maintenance fees in the amount of $4,800, plus a $50 per year late payment penalty for not paying the maintenance fees within 60 days. The petition alleged, in pertinent part, as follows:

7. That the Declaration of Condominium for the Surrey Condominium, includes a plan to cover the expenses that are common to the development, and in particular, at Article VII declares that all unit owners and unit week purchasers shall share in

the cost of the common expense and that pursuant to Article VIII, all such owners, shall pay a maintenance fee, and that the maintenance fee shall be assessed and collected by the association or its designated agent. . . .

12. That said maintenance fees and dues, have been assessed as pertaining to these Defendants, in the amount of Nine Thousand Seven Hundred Dollars and No Cents ($9,700.00) as of the 1st day of January, 2002. A copy of said assessment, and account therefore [sic], is attached hereto and marked as Exhibit "A".

Exhibit A contained the following description of the unpaid charges: (1) "MAINT FEE 2001"; (2) "LATE FEE MAINTENANCE"; (3) "MAINT FEE 2002"; and (4) "LATE FEE MAINTENANCE[.]" The amount of the charges is as set forth above.

At the trial, condominium project manager Jason Henrichson ("Henrichson") testified that the Declaration required Unit Owners, as well as Unit Week Purchasers, to pay maintenance fees. Henrichson also explained how Imogene's maintenance fees of $400 per month were calculated. Henrichson said the Association prepared an anticipated budget for the upcoming year that was divided into two categories: timeshare expenses and common area expenses. Imogene's assessment was derived by calculating a "weekly" assessment for each expense subcategory included in the general category of "common area expenses" and then multiplying the charge by 52 (for 52 weeks of ownership of Unit No. 1). Thus, Imogene's assessment was

---

4. Originally, there were three other Unit Owners besides the Webbs. The other 24 units were committed to interval ownership. By the year 2000, however, Imogene was the only remaining Unit Owner in the development.

calculated as if she were a Unit Week Purchaser. Her assessment also included a number of anticipated charges that appeared to relate, either primarily or exclusively, to services, benefits or expenses incurred for Unit Week Purchasers.

Using the 2001 assessment as an example, Henrichson testified that the anticipated "common area expenses" totaled $188,890. Included as a part of the common area expenses, however, was a subcategory titled "reserve fund." This expense subcategory comprised $54,742 (29%) of the total common area expenses. Henrichson testified that money from this fund was used to physically remodel the interval ownership units. Funds from this expense subcategory were used to pay for new paint, wallpaper, carpeting, furniture, beds and mattresses in the time-share units. Henrichson admitted Imogene received no benefit from these expenditures. Imogene's allocated share of this expense subcategory was $1,218 per year.

The condominium developer also held an elaborate party once a week for "time-share people." The purpose of this weekly party was to promote the sale of unit weeks to new buyers and create a "fun atmosphere" for prospective and existing Unit Week Purchasers. The cost of these events was included in an expense subcategory called "hospitality" under the common area expenses. In 2001, this "hospitality" subcategory comprised $6,972 (3.7%) of the total common area expenses. Imogene's allocated share of this expense was $271.96 per year.

Another common area expense subcategory was called Merchant Fee/Charge Card. In 2001, this expense subcategory comprised $4,164 (2.2%) of the total common area expenses. Until 2000, when the assessment dispute arose, Imogene always paid her assessment by check. Henrichson agreed it was unreasonable to charge Imogene this fee because it was only to apply to those who paid their maintenance fees by credit card. Imogene's allocated share of this expense was $162.76 per year.

Finally, the common area expenses included a subcategory called "reserve for uncollectibles." In 2001, this "expense" subcategory comprised $24,634 (13%) of the total common area expenses. This category was included to reflect anticipated uncollectible maintenance fees for the upcoming year. The purpose of this subcategory was to make the other owners "take up the slack for any owner that doesn't pay their fair share of the assessments." Imogene's allocated share of this expense was $962 per year.

After considering the evidence, the trial court ruled that the maintenance fees assessed by the Association against Imogene and the resultant assessment lien were void and unenforceable. This appeal followed.

■ In this court-tried case, our review is governed by Rule 84.13(d).[5] We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Ridgway v. TTnT Dev. Corp.*, 126 S.W.3d 807, 812 (Mo.App. 2004).[6] The trial court's judgment is presumed correct, and the Association has the burden of proving it erroneous. *See Lee v.*

5. All references to rules are to Missouri Court Rules (2005).

6. *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

*Hiler,* 141 S.W.3d 517, 520 (Mo.App.2004); *Wingate v. Griffin,* 610 S.W.2d 417, 419 (Mo.App.1980). An appellate court reviews the evidence and all reasonable inferences in the light most favorable to the judgment and disregards all contrary evidence and inferences. *Lee,* 141 S.W.3d at 520. "Judging credibility and assigning weight to evidence and testimony are matters for the trial court, which is free to believe none, part, or all of the testimony of any witnesses." *Savannah Place, Ltd. v. Heidelberg,* 122 S.W.3d 74, 86 (Mo.App. 2003). We defer to the trial court's superior opportunity to assess the witnesses' credibility. *Mortenson v. Leatherwood Constr., Inc.,* 137 S.W.3d 529, 531 (Mo. App.2004). Since the trial court made no specific findings of fact or conclusions of law because none were requested, we consider all fact issues as having been determined in accordance with the result reached. Rule 73.01(c); *Tucker v. Tucker,* 124 S.W.3d 16, 18 (Mo.App.2004). Finally, we are primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result. *Business Men's Assur. Co. of America v. Graham,* 984 S.W.2d 501, 506 (Mo. banc 1999). Therefore, we will affirm the trial court's judgment under any reasonable theory supported by the evidence. *Jackson v. Cannon,* 147 S.W.3d 168, 173 (Mo.App.2004).

▮▮▮▮ In the Association's lone point on appeal, it argues the judgment is based on a misapplication of the law and is not supported by the evidence because Imogene is not being required to pay her fair share of the common expenses. On appeal, however, the Association is bound by the position it took in the trial court and will not be heard on a different theory. *See, e.g., id.* at 171–72; *Erwin v. City of*

*Palmyra,* 119 S.W.3d 582, 587 n. 3 (Mo. App.2003). The theory the Association pled and tried below was that Imogene owed "maintenance fees" for the years 2001 and 2002. Accordingly, we confine our review to whether the trial court erred in rejecting this theory of recovery. *See Heffernan v. Reinhold,* 73 S.W.3d 659, 663 (Mo.App.2002) (review on appeal is limited to theories properly advanced before the trial court).

▮▮▮▮ A condominium association may only exercise its powers within the constraints of its condominium declaration. *Eagan v. Mueller,* 809 S.W.2d 411, 413 (Mo.App.1991). In the case at bar, our review of Articles VII, VIII and XIV of the Declaration convinces us that the Association can only assess a maintenance fee against a Unit Week Purchaser. Imogene was a Unit Owner, not a Unit Week Purchaser. Moreover, the trial court could have found from the evidence presented that the Association was assessing a "maintenance fee" against Imogene, based on the various component charges that were included in her assessment. For example, Article VIII of the Declaration specifies that, in addition to true common expenses, the "maintenance fee" assessed against a Unit Week Purchaser can include his or her pro rata share of the cost of repainting the unit, replacing furniture and carpeting, etc. Imogene's assessment was calculated using a "reserve fund" charge, which included anticipated expenses for refurbishing interval ownership units. As a Unit Owner, Imogene received no benefit from such expenditures. The same is true of the charges included in her assessment for time-share sales parties, credit-card fees and liability for other interval owners' uncollected maintenance fees.[7] The trial court could have found

7. In view of the fact that the Association can

and does seek to collect unpaid maintenance

that all of these charges constitute charges for services, benefits or liabilities relating either primarily or exclusively to Unit Week Purchasers.

Because the Association may exercise its authority to levy and collect assessments only in the manner provided in the Declaration, it did not have the authority to assess a maintenance fee against a Unit Owner like Imogene. Therefore, the trial court correctly applied the law when it decided the Association's maintenance fees and its assessment lien were void. *See Eagan*, 809 S.W.2d at 413. Furthermore, this decision rested on a substantial evidentiary foundation and was not against the weight of the documentary and testimonial evidence presented at trial. Accordingly, the trial court's judgment is affirmed.

PARRISH, P.J., and BARNEY, J., Concur.

fees by turning the accounts over to collection agencies, pursuing the claims in court and enforcing the Association's lien rights, we fail to understand how these delinquent accounts can constitute common area expenses that other owners can be forced to pay.