

# Missouri Court of Appeals

## Southern District

### Division One

JERRY JACOB McCLAIN,                              )
by and through his Mother and Next Friend,        )
Lori Rutledge, DR. ALLEN NORTHERN,                )
and ROLLA MEDICAL GROUP                           )
AND WOMEN'S CLINIC, INC.,                         )
                                                  )
      Plaintiffs-Appellants,          )
                                                  )
    vs.                               )   No. SD32591
                                                  )   Filed:  October 1, 2014
MARY JAMES, Defendant ad Litem                    )
for Estate of Charles A. James, M.D. [sic],       )
LLOYD DOWNARD, JOHN LINDE, M.D.,                  )
JOHN SCHWENT, M.D., JAMES CESAR, D.O.,            )
ALAN DOERHOFF, M.D., CARTER                       )
FENTON, D.O., ADELUOLAG G. LIPEDE, M.D.,          )
JAMES FLANARY, D.O.,                              )
PHYSICIANS DEFENSE ASSOCIATION,                   )
and BENNY THOMAS, D.O.,                           )
                                                  )
      Defendants-Respondents.         )

### APPEAL FROM THE CIRCUIT COURT OF PHELPS COUNTY

Honorable John B. Berkemeyer, Associate Circuit Judge

### AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS

Plaintiff Jerry Jacob McClain, by and through his mother and next friend, Lori Rutledge

(collectively "McClain"), Dr. Allen Northern, and Rolla Medical Group and Women's Clinic,

Inc. (collectively "Northern"), appeal from a judgment in favor of Defendants James Flanary, James Cesar, Alan Doerhoff, Carter Fenton, Adeluolag Lipede, Benny Thomas, John Linde, and John Schwent (collectively "Physicians"), Lloyd Downard, Mary James as defendant ad litem for the Estate of Charles James, and Physicians Defense Association ("PDA") on all eleven counts of Plaintiffs' Fourth Amended Petition. Counts II through VII, "equitable claims of action," were bench-tried on July 26, 2012, without jury involvement by agreement of the parties. Counts I and VIII through XI, "legal claims of action," were decided by summary judgment on December 13, 2012, resulting in the final judgment now before us. For reasons stated herein, we affirm the judgment as to Counts II through X, but reverse and remand as to Counts I and XI.

<b>Factual and Procedural Background</b>

This is the third trip to this court for these historically-complex proceedings. *See McClain v. Carpio*, 338 S.W.3d 361 (Mo.App. S.D. 2011); *Northern v. Physicians Defense Association*, 88 S.W.3d 130 (Mo.App. S.D. 2002). We borrow extensively from *Carpio*, 338 S.W.3d at 364-68, in describing the background of the litigation.

In April 1986, the Director of the Missouri Division of Insurance ("DIFP"),[1] by authority granted in Chapter 383, RSMo, issued PDA a Certificate of Authority to engage as a corporation, in accordance with its Articles of Association, in the business of malpractice insurance in the state of Missouri. The next day, PDA filed its Articles of Association with the Missouri Secretary of State. PDA's purpose was to provide professional liability insurance or indemnification for persons licensed under the provisions of Chapter 334, RSMo, and corporations formed for the practice of medicine under Chapters 351 and 356, RSMo. PDA was an assessment mutual insurance company in which members paid an assessment upon

---

[1] Now known as the "Department of Insurance, Financial Institute & Professional Registration" ("DIFP").

membership and agreed to pay additional assessments as necessary for coverage of liability. Its board of directors, however, never made any special assessments against any policyholders or members. PDA had no shareholders.

On January 1, 1995, Northern purchased a professional liability insurance policy ("the Policy") from PDA covering the period January 1, 1995, to December 31, 1997, which provided coverage in the amounts of $200,000 per person and $600,000 per occurrence for "claims made."

During that coverage period, on January 2, 1997, McClain filed a medical malpractice claim in Phelps County Circuit Court against Northern and others based on their negligence during Jerry McClain's delivery and birth on May 2, 1995 ("*McClain I*"). Jerry McClain was born with severe birth defects.

Also during the first part of 1997, PDA's board of directors decided to discontinue business and endorsed another insurance carrier to replace outstanding policies of liability insurance. All business activity of PDA associated with new business and underwriting was discontinued effective July 1, 1997. A special meeting of the PDA members was held on August 12, 1997, at which the members voted to dissolve PDA. The membership also accepted the resignation of the board of directors and approved the appointment of Lloyd Downard and Charles James to continue as officers and trustees of PDA to complete all acts necessary for its dissolution. Also on that date, PDA's membership and board of directors approved payment to Lloyd Downard and Charles James in the sum of $168,000 each, which had not previously been required by their employment contracts.

In 1997, at the time of these actions, all Physicians were PDA members.[2]

Between August 25, 1997, and September 29, 1997, PDA distributed to some Physicians sums ranging from $965 to $19,046.

McClain's malpractice case that was pending in Phelps County was dismissed without prejudice in June 1999 and then re-filed in that same county on August 16, 1999 ("*McClain II*").

After a trial on the record, judgment was entered in *McClain II* on August 10, 2000, in favor of McClain and against Northern in the amount of $14,425,916. This judgment also found that a section 537.065 settlement agreement entered into between McClain and Northern on March 27, 2000, was made in good faith and was reasonable.[3]

In September 2000, Plaintiffs filed a three-count action against PDA ("*McClain III*") in which Plaintiffs sought a declaration that the Policy issued by PDA covered the *McClain II* judgment; McClain sought equitable garnishment; and Northern sought damages against PDA, his insurer, for failing to defend and indemnify him against McClain's malpractice claims.

On or about December 1, 2000, PDA again distributed to some Physicians sums ranging from $100 to $4,900.

On January 29, 2001, Downard, in his capacity as secretary of PDA, signed and filed Articles of Dissolution and Articles of Termination with the Missouri Secretary of State. The

---

[2] Charles James was not a medical doctor and was never a PDA member. He was a full-time professor of economics and finance at Saint Louis University in Saint Louis, Missouri. He formed PDA in April 1986 and served as its president until his death in 2004. Charles James also had a seat on PDA's Board of Directors, and served on the management, claims, and settlement committees, but was never a full-time employee of PDA. He had several other business interests that occupied his professional time beyond his association with PDA. Mary James is the appointed defendant ad litem for the Estate of Charles A. James, Ph.D. Her appointment was necessary due to the death of Charles James in 2004, during the pendency of this litigation. Downard had "extensive insurance company experience" and was a broker for 40+ years, "licensed to market professional liability insurance." In 1996, Downard was appointed secretary/treasurer of PDA; served on the management, claims, and settlement committees; and became a paid employee of PDA. In May 1997, Downard became a "Director" of PDA. Downard remained a paid employee of PDA until 2001, when it was dissolved.

[3] Section 537.065, originally enacted by our General Assembly in 1959, permits a claimant and tortfeasor to contract to limit any recovery by a claimant to specific assets or an insurance contract.

articles stated that "all debts, obligations and liabilities of the corporation have been paid and discharged, or adequate provision has been made therefore." Contrary to that representation, PDA had not made adequate provision to discharge its liabilities, specifically the judgment entered against it in *McClain II*, nor any contingent plans for potential liability in *McClain III*. Downard testified in his deposition[4] that when he filed and signed the Articles of Termination, it was with full knowledge that *McClain III* was pending, and that if a judgment was rendered in favor of Northern, PDA would be responsible for payment of any judgment up to the policy limits, as well as payment of Northern's attorney fees and expenses. Further, Downard had been previously notified in 1997 by Dennis Engel, Examiner-In-Charge from the DIFP, that some of PDA's contract payments were in question. On that same day, January 29, 2001, the Missouri Secretary of State issued a Certificate of Termination of PDA certifying that the corporate existence of PDA ceased as of that date.

PDA published notice of dissolution and notice to file claims pursuant to section 351.482(3), RSMo (previously section 351.565, RSMo) in the *Jefferson City Tribune* on February 9, 2001, and in *Missouri Lawyers Weekly* on February 12, 2001.

By letter dated February 12, 2001, counsel for Jerry McClain provided notice to PDA of his claims and the judgment in *McClain II* against Northern. The letter also advised of the pending *McClain III* action.

Partial summary judgment was entered in *McClain III* on October 23, 2001, in favor of Plaintiffs and against PDA, finding that PDA's Policy provided coverage for the judgment in *McClain II*. On interlocutory appeal in *Northern*, this court affirmed.

Thereafter, on May 12, 2003, the trial court in *McClain III* finally decided Northern's damages claim, entering a $15,000 judgment in Northern's favor against PDA "as compensatory

---

[4] Lloyd Downard's deposition was taken on June 26, 2012, in the current litigation that is the subject of this appeal.

damages for [PDA]'s breach of contract." PDA did not appeal, nor has PDA satisfied Northern's judgment or the $14,425,916 *McClain II* judgment.

## This Action (*"McClain IV"*)

In March 2003, Plaintiffs filed their original petition in this action against Charles James and thirty-five unknown and unnamed directors of PDA, seeking recovery for alleged fraudulent transfers made by Charles James, as president of PDA, in 1997, to PDA's directors. Plaintiffs amended their petition in 2004, 2006, and 2007.

In March 2010, Plaintiffs filed the eleven-count Fourth Amended Petition at issue in this case (hereafter "Petition").[5] Defendants won a summary judgment in the trial court based on the statute of limitations, which we reversed and remanded in *Carpio*.

---

[5] Those eleven counts were, and still are:

    Count I ("Fraud") against James, Downard, and PDA, seeking recovery for fraud in misrepresentations made in the Policy when it was issued and for misrepresentations Downard made to the Missouri Secretary of State on or about January 29, 2001, in PDA's Articles of Termination.

    Count II ("Mandamus") seeks a writ of mandamus against James, Downard, Linde, and Schwent that, as a result of the alleged misrepresentations in the Articles of Termination, "PDA, through its last Board of Directors and statutory Trustees, should be ordered . . . to assess its member's [sic] sufficient amounts to cover the judgment [in the malpractice action]."

    Count III ("Constructive Trust") requests, against each individual defendant, the imposition of a constructive trust on the funds received by each of them from PDA.

    Count IV ("Unjust Enrichment") seeks damages for each individual defendant's unjust enrichment from funds received by each of them from PDA.

    Count V ("Equitable Assessment") asserted against all individual defendants who were members of PDA, prays for "the Court to enter its order and judgment against Defendants including members/shareholders of PDA to pay assessments equivalent to their proportionate share of the judgment against PDA" in the malpractice action.

    Count VI ("Accounting") originally against all defendants—but later mooted by discovery as to all defendants except James, Downard, and PDA—prays for a judgment "ordering an accounting of the distributions made by PDA [.]"

    Count VII ("Fraudulent Transfers") seeks damages against James, Downard, Linde, and Schwent, as statutory trustees of PDA, for alleged transfers that were fraudulent, "pursuant to Chapter 351 of the Missouri Revised Statutes, including Section 351.478," by payments made from PDA "to its directors and members while the McClain claim was still pending[.]"

The trial court conferred with counsel after this Court's ***Carpio*** remand. The parties agreed that Counts I and VIII-XI were "legal claims of action," and that all other counts were "equitable claims of action" which "contain issues of fact to be determined by a jury." Subsequently, however, Plaintiffs announced that "no facts as presented in Counts II, III, IV, V, VI, or VII, [were] to be preserved and presented for determination at a trial by jury." The parties agreed that these equitable claims could be wholly bench-tried, which took place on July 26, 2012. The trial court received evidence, heard argument, and took these six claims under advisement. On October 15, 2012, the court granted judgment in Defendants' favor on all "equitable claims of action."

Later, PDA, James, and Downard moved for summary judgment on the remaining legal claims, which the trial court granted on December 13, 2012.

Plaintiffs raise eight points on appeal. Six involve the court-tried claims, which we consider first.

**Court-Tried Claims**

Plaintiffs' points challenge only three of the six court-tried results: Counts II, V, and VII. Even then, five of six points address only affirmative defenses or other *alternative* grounds for

---

Count VIII ("Bad Faith") is a damage claim by Northern against PDA, alleging that PDA acted in bad faith in failing to properly defend, protect, and indemnify Northern against McClain's malpractice claims.

Count IX (Negligent Claims Handling) incorporated Count VIII's allegations by reference and alleged that PDA was negligent in fulfilling duties of defense, claims handling, and settlement in connection with McClain's malpractice claims.

Count X (Breach of Fiduciary Duties) ) incorporated Count VIII and IX's allegations by reference and alleged that PDA breached fiduciary duties in failing to properly defend, protect, and indemnify Northern against McClain's malpractice claims.

Count XI (Punitive Damages) is a punitive damages claim by "Plaintiffs" against PDA which incorporates by reference all ten preceding counts.

7

the court's decision.[6]  We need not reach those if Plaintiffs failed to prove a right to relief as pleaded in these counts of their Petition.

## Standard of Review – Court-Tried Claims

We must affirm the judgment as to bench-tried claims unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law.  **Murphy v. Carron**, 536 S.W.2d 30, 32 (Mo. banc 1976).  The judgment is presumed correct, and Plaintiffs have the burden of proving otherwise.  **Surrey Condo. Ass'n v. Webb**, 163 S.W.3d 531, 535-36 (Mo.App. S.D. 2005).

We view the record and all reasonable inferences most favorably to the judgment, disregarding all contrary evidence and inferences.  **Id.** at 536.  "'Judging credibility and assigning weight to evidence and testimony are matters for the trial court, which is free to believe none, part, or all of the testimony of any witnesses.'"  **Id.** (quoting **Savannah Place, Ltd. v. Heidelberg**, 122 S.W.3d 74, 86 (Mo.App. S.D. 2003)).

This bench-tried judgment includes numerous factual findings; we consider "all other factual issues to have been determined in accordance with the result reached."  **Grider v. Tingle**, 325 S.W.3d 437, 441 (Mo.App. S.D. 2010).

"Finally, we are primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result.  Therefore, we will affirm the trial court's judgment under any reasonable theory supported by the evidence."  **Surrey Condo.**, 163 S.W.3d at 536 (internal citation omitted).

---

[6] These alternative grounds included lack of standing (challenged by Point III); *res judicata*/collateral estoppel as to equitable claims (Point IV); release (Point V); failure to join indispensable parties (Point VI); and whether an exclusive statutory remedy precluded mandamus (Point VII).

### Count II

Count II sought a writ of mandamus ordering PDA to assess its members to satisfy the $14 million judgment. For relief in mandamus, Plaintiffs had to prove (1) their "existing, clear, unconditional legal right" to that assessment, *and* (2) "a corresponding present, imperative, unconditional duty" of PDA (or some defendant) to do so. ***State ex rel. St. Joseph Hospital v. Fenner***, 726 S.W.2d 393, 395 (Mo.App. W.D. 1987). Plaintiffs, on appeal, do not even suggest that they proved either of these.

As the judgment notes, special assessments were "'at the <u>discretion of the Board of Directors</u>'" (quoting PDA Bylaws; trial court's emphasis), a finding not challenged on appeal. Mandamus does not lie to compel exercise of discretionary authority. *See **Woods v. State***, 371 S.W.3d 928, 929 n.3 (Mo.App. S.D. 2012). The trial court did not err in ruling Count II against Plaintiffs.

### Count V

In Count V, Plaintiffs alleged that the trial court had "inherent equitable power" to assess Physicians, as PDA members, $14 million *pro rata*. The trial court disagreed, noting that "liability of the members of a Chapter 383 association is limited by §383.025:

> 'No member of the association shall be liable for any amounts because of his membership in the association other than his assessments as provided in the articles of association, the bylaws of the association or as ordered by the director of the [DIFP] pursuant to section 383.035.'"

On appeal, Plaintiffs cite only a 1907 case that enforced an Ohio court's $212.53 assessment under an Ohio statute.[7] Plaintiffs never mention, let alone argue against, the *Missouri* statute cited by the trial court and quoted in the judgment. This refusal to address the *ratio decidendi* defeats their argument.

---

[7] *See **Swing v. Karges Furniture Co.***, 100 S.W. 662 (Mo.App. ST.L.D. 1907).

9

To assert that courts "inherently" can assess PDA members is not consistent with section 383.025.  The trial court did not err in denying Count V.

### Count VII

Count VII of the Petition alleges a claim for fraudulent transfer to directors and members while the McClain claims were pending.  Had the trial court believed Plaintiffs' evidence and ruled in their favor, our standard of review almost certainly would require us to defer to the trial court and affirm its decision.

But Plaintiffs did *not* persuade that court, which weighed the proof and found:

- "no persuasive or credible evidence" that PDA paid contract amounts to James or Downard with the intent to hinder, delay, or defraud Plaintiffs;

- "no persuasive or credible evidence" that PDA paid contract amounts to James or Downard without getting reasonable equivalent value in exchange;

- "no persuasive or credible evidence" that PDA was dissolved with sole or primary purpose to defraud its members, creditors or others; and

- PDA members voted to dissolve in 1997 "because of competition from other companies and because of PDA's inability to obtain additional capital in the market.  The members were not involved in a scheme to defraud the Plaintiffs."

Our deference to such credibility findings, express and implied, defeats Plaintiffs' "against the weight of evidence" complaint.  *See **Ivie v. Smith***, No. SC93872, slip op. at 26-30 (Mo. banc July 8, 2014).

Indeed, no evidence is needed to sustain this judgment.  Plaintiffs bore the burden of proof.  The trial court found their evidence not persuasive or credible.  To quote our supreme court in ***Ivie***, "the circuit court is free to believe all, some, or none of the evidence offered to prove a contested fact, and the appellate court will not re-find facts based on credibility determinations through its own perspective." *Id.*, slip op. at 27.  "This Court defers to the circuit court's determinations [of credibility].  Therefore, the circuit court's judgment was not against the weight of the evidence." *Id.*, slip op. at 30.

10

For these reasons, and also because Plaintiffs' Point VIII "against the weight" arguments lack any analytical or persuasive value,[8] we cannot reverse on this count. We deny Plaintiffs' point and affirm the judgment as to Count VII.

### *Summary as to Court-Tried Claims*

The trial court did not err in granting Defendants judgment on Counts II, III, and VII. Plaintiffs do not challenge the judgment against them as to Counts III, IV, or VI. Thus, we affirm the judgment as to Counts II through VII inclusive.

### Summary Judgment Claims

These claims involve just three Defendants: Charles James (Count I), Downard (Count I), and PDA (all legal claims). Our principles of review on summary judgment are nearly opposite of what they were in reviewing the court-tried claims.

### *Principles of Review – Summary Judgment*

In determining whether a trial court has properly granted summary judgment, we review the matter *de novo* and give no deference to the trial court's decision. *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 452 (Mo. banc 2011); *State ex rel. Nixon v. Bass*, 282 S.W.3d 343, 344 (Mo. banc 2009). We employ the same criteria the trial court should have used in deciding

---

[8] Plaintiffs' Point VIII argument wholly fails to assert a proper "against-the-weight-of-the-evidence challenge [which] requires completion of the following four sequential steps:

> '(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
> (2) identify all of the favorable evidence in the record supporting the existence of that proposition;
> (3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
> (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.'"

*Kelley v. Widener Concrete Const., LLC*, 401 S.W.3d 531, 543 (Mo.App. S.D. 2013). Plaintiffs' failure to follow this framework renders their argument "analytically useless and provides no support for [their] challenge." *Marriage of Adams*, 414 S.W.3d 29, 34 (Mo.App. S.D. 2013). *See also* *Houston v. Crider*, 317 S.W.3d 178, 188 (Mo.App. S.D. 2010).

whether to grant the motion. ***Barekman v. City of Republic***, 232 S.W.3d 675, 677 (Mo.App. S.D. 2007).

We review the record in the light most favorable to the party against whom judgment was entered and accord the non-movant the benefit of all reasonable inferences. ***ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.***, 854 S.W.2d 371, 376 (Mo. banc 1993). In this case, PDA, James, and Downard were "defending" parties and in order to establish a right to summary judgment they must show:

> (1) facts that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support the movant's properly-pleaded affirmative defense.

*Id.* at 381 (emphasis in original). "[A] 'genuine issue' exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." *Id.* at 382.

Summary judgment is an extreme and drastic remedy and we exercise great caution in affirming it because the procedure cuts off the opposing party's day in court. *Id.* at 377.

Bearing these principles in mind, we address the summary judgment counts out of order.

### *Counts VIII-X*

In ***McClain III***, Northern sought damages from his insurer PDA for failing to properly defend, protect, and indemnify him against McClain's malpractice claims. His theory was breach of contract. He won a money judgment against PDA, now final.

Here, Northern again seeks damages from his insurer PDA for failing to properly defend, protect, and indemnify him against McClain's malpractice claims. His new theories are "bad

faith" (Count VIII), "negligent claims handling" (Count IX), and "breach of fiduciary duties" (Count X).

Northern's new counts violate *res judicata*'s bar on claim splitting. *See **Chesterfield Village v. City of Chesterfield***, 64 S.W.3d 315, 318-21 (Mo. banc 2002); ***King Gen. Contractors v. Reorganized Church***, 821 S.W.2d 495, 501-02 (Mo. banc 1991); ***Palmore v. City of Pacific***, 393 S.W.3d 657, 664-67 (Mo.App. E.D. 2013); ***Dahn v. Dahn***, 346 S.W.3d 325, 331-32 (Mo.App. W.D. 2011); ***Chadd v. City of Lake Ozark***, 326 S.W.3d 98, 101-03 (Mo.App. W.D. 2010); ***Williams v. Rape***, 990 S.W.2d 55, 59-61 (Mo.App. W.D. 1999). *See also* RESTATEMENT (SECOND) OF JUDGMENTS §§ 24, 25 (1982). Summary judgment was proper as to these counts.

### *Count I*

Count I seeks recovery for fraud. To prevail on such a claim, a plaintiff must prove:

> '(1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance of the truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the representation; (5) the hearer's reliance on its truth; (6) the hearer's right to rely thereon; and (7) the hearer's consequent and proximately caused injury.'

***Artilla Cove Resort, Inc. v. Hartley***, 72 S.W.3d 291, 296-97 (Mo.App. S.D. 2002) (quoting ***Thoroughbred Ford, Inc. v. Ford Motor Co.***, 908 S.W.2d 719, 731 (Mo.App. E.D. 1995)). "The falsity element of fraud relates to a speaker's reckless disregard of the truth or falsity of the statement as opposed to a speaker's negligent failure to exercise reasonable care or competence to ensure that truthful information is being relayed." ***Renaissance Leasing, LLC v. Vermeer Mfg. Co.***, 322 S.W.3d 112, 135 n.22 (Mo. banc 2010). To recover damages based upon fraudulent representations, it is not necessary that it be shown that a defendant had actual knowledge of the falsity of the facts stated by him. It is sufficient that he made the

13

representations with the consciousness that he was without knowledge as to their truth or falsity, when in fact, they were false.

Because of the nature of fraud, it is rare for a party accused of fraud to come forward and admit it. However, "[f]raud can be shown by circumstantial evidence[.]" *Osterberger v. Hites Construction Company*, 599 S.W.2d 221, 229 (Mo.App. E.D. 1980). As "fraud is seldom capable of direct proof," it may be established by a variety of circumstances combined together. *Watson v. Harris*, 435 S.W.2d 667, 674 (Mo. 1968). As explained below, a genuine issue of material fact exists as to whether PDA, Downard, and Charles James made false statements to government agencies in order to avoid PDA's obligations to satisfy the judgments in *McClain II* and in *McClain III*.

When statutes or regulations impose an obligation on a person in the course of their profession or employment, the duty owed by the statute or regulation is a public one and the duty to do so truthfully extends to all persons within the class of persons for whose benefit the duty is created. *B.L. Jet Sales, Inc. v. Alton Packaging Co.*, 724 S.W.2d 669, 672 (Mo.App. E.D. 1987). One need not be the direct hearer of a false statement in order to pursue a cause of action in fraud. *See Wagner v. Mortgage Information Services, Inc.*, 261 S.W.3d 625, 640 (Mo.App. W.D. 2008). Furthermore, when a person, in the course of their profession or employment, gives false information and is under a public duty to give the information, that person is liable for the losses "suffered by any of the class of persons for whose benefit the duty is created[.]" *B.L. Jet Sales, Inc.*, 724 S.W.2d at 672. A public duty arises when regulations require certain actions be taken. Under those circumstances, the duty extends to the class of persons for whose benefit the duty is created by the statute or regulation. *Id.* at 672-673. An intentional or fraudulent act by a corporation is a breach of trust, which may permit an action by a creditor. *Drummond Company*

14

***v. St. Louis Coke & Foundry Supply Co.***, 181 S.W.3d 99, 103 (Mo.App. E.D. 2005). Corporate directors and officers who exceed their trustee-like statutory duties in winding up the business affairs of a dissolved corporation may become personally liable pursuant to section 351.476.2(3). ***Id.*** at 104.

The statutes and regulations regarding the dissolution of a corporation require that a corporation maintain a solvent position until its liquidation has been completed. The reason for these statutes and regulations are so the corporation can satisfy, or attempt to satisfy, its debts and obligations to all creditors and claimants. PDA's creditors clearly fall within that class of people that the statutes and regulations are established to protect. Plaintiffs clearly fall within the class of persons for whom protection is available.

As an association formed to operate under Chapter 383, PDA was bound to comply with the requirements for dissolution as set forth in Chapter 355.[9] Chapter 355 provides that a claim against a corporation that is dissolved after authorization, and which was dissolved *without fraudulent intent*, may be barred in certain circumstances. The statute provides that "'fraudulent intent' shall be established if it is shown that the sole or primary purpose of the authorization for dissolution or the dissolution was to defraud shareholders, creditors or others." § 355.696.5. Based on the record before us, that is an issue of material fact to be decided by a trier of fact.

An officer of a corporation can be held liable for fraud if he had actual or constructive knowledge of the actionable wrong and participated therein. ***Osterberger***, 599 S.W.2d at 229; *see also* ***McKeehan v. Wittles***, 508 S.W.2d 277, 283 (Mo.App. St.L.D. 1974); ***City of St. Louis***

---

[9] PDA filed Articles of Dissolution with the Missouri Secretary of State on January 29, 2001. Chapter 355 provides specific procedures that must be followed by a corporation, such as PDA, to dissolve and to terminate its existence. Section 355.681.1 provides that following a corporation's authorization of dissolution by its members, a corporation may dissolve by filing Articles of Dissolution with the Missouri Secretary of State. Section 355.696.1 provides the manner in which a dissolved corporation shall dispose of the known claims against it. It provides that the dissolved corporation must provide notice to its known claimants in writing and provide a deadline by which the dissolved corporation must receive the claim. § 355.696.2(1)-(4).

*v. Boos*, 503 S.W.2d 133, 135 (Mo.App. ST.L.D. 1973). The record before us discloses that as trustees of PDA, Downard and James can be sued in place of PDA, pursuant to PDA's own Bylaws, at a minimum.[10]

The summary judgment record includes evidence that PDA, by and through its trustees Downard and James, made at least two statements that raise this material issue of fact. The first statement was made in a November 11, 1998 letter to Steven Divine, Chief Financial Examiner for the DIFP, indicating that PDA had amended its compensation contracts to limit compensation of its officers/employees—who at that time were Downard and James. The second statement occurred on January 29, 2001, when PDA filed Articles of Termination with the Missouri Secretary of State that stated "[a]ll debts, obligations and liabilities of the corporation have been paid and discharged, or adequate provision had been made therefore." Plaintiffs are and were creditors of PDA, and they hold judgments that have not been satisfied.

Following January 29, 2001, when the Articles of Termination were filed, in reliance on those Articles, the Missouri Secretary of State issued a Certificate of Termination, certifying that PDA ceased to exist.

We believe that reasonable jurors could infer, from the evidence we have cited, that the information provided by the trustees was false and that it was given without exercising reasonable care or with the knowledge that it was false.

There is also evidence that PDA, by and through its trustees, did not follow the statutory procedure by which a non-profit corporation is to terminate and dissolve.

---

[10] Pursuant to Article IX Dissolution, paragraph "2. Authority to Wind Up" of PDA's Bylaws, trustees Downard and James became solely and exclusively responsible for managing the assets and liabilities of PDA. As trustees of PDA, they were vested with the full authority to "*pay its debts and obligations, set aside funds for contingent liabilities and expenses, and distribute the net assets among the members. . . . [T]he trustees may be sued in [PDA]'s name*." (Emphasis added).

16

Inspector Engel made the following comments to PDA in his final report:

> Since amounts were still payable for compensation settlements which establish liabilities creating a negative surplus position for [PDA] and since these compensation settlements were not owed under the terms of the contracts, [PDA] should take the necessary actions to ensure that it maintains a solvent position until its liquidation has been completed. *This may include canceling any additional compensation payments or seeking the return of compensation already paid on these compensation settlements.*

In response to this comment, Downard, on behalf of PDA, in its November 11, 1998 letter to the DIFP, stated: "Compensation contracts between [PDA] and its officers/employees were amended to provide for limited annual compensation or payment upon dissolution whichever event occurs first." However, there was evidence, as set forth above, that a jury could believe that the statements regarding the compensation contracts were false.

Plaintiffs are in the class of people who are protected by their position as corporate creditors. It is incumbent upon PDA, by and through its trustees, to make truthful statements to the DIFS and the Missouri Secretary of State so that corporate creditors, among others, may be protected as anticipated by the voluntary dissolution process. This process clearly requires there be no fraudulent intent. Had there not been false representations, there is evidence that Defendants would have been able to satisfy, or at least address the judgments ultimately entered against PDA. Plaintiffs have suffered a pecuniary loss by these representations because the judgments are unsatisfied.

Based on the foregoing, Plaintiffs have established that genuine issues of material fact exist that PDA, by and through its directors and trustees, Downard and James, committed fraud as alleged in Count I. Count XI seeks punitive damages for fraud as alleged in Count I. Because

17

that is still an issue for the trier of fact, it must be reversed, also.  We reverse the summary judgment granted as to Counts I and XI.[11]

## Conclusion

We reverse the judgment with respect to Counts I and XI only, and remand those counts to the trial court for further proceedings consistent with this opinion.  In all other respects, the judgment is affirmed.

WILLIAM W. FRANCIS, JR., C.J./P.J. - OPINION AUTHOR

NANCY STEFFEN RAHMEYER, P.J. - CONCURS IN MAJORITY OPINION

DANIEL E. SCOTT, J. – CONCURS IN PART AND DISSENTS IN PART IN SEPARATE
OPINION

---

[11] This is not inconsistent with our affirmance of the bench-tried judgment against Plaintiffs on their Count VII fraudulent transfer claim, which alleged different acts and types of fraud.  The two claims lack sufficient identity for judgment on either to preclude or mandate a particular judgment on the other.

18



# Missouri Court of Appeals

## Southern District

### Division One

JERRY JACOB McCLAIN, et al.,      )
                                  )
        Plaintiffs-Appellants,    )
    vs.                           )        No. SD32591
                                  )
MARY JAMES, et al.,               )
                                  )
        Defendants-Respondents.   )

**OPINION CONCURRING IN PART AND DISSENTING IN PART**

I concur in affirming the judgment as to Counts II through X.  I respectfully

dissent from the reversal as to Counts I and XI.

Count I alleged fraud in two respects.  One has been abandoned on appeal.[1]

The other asserted that Downard misled the Secretary of State in connection with

PDA's corporate termination and (quoting Plaintiffs' petition):

- "That the State of Missouri and Secretary of State Matt Blunt were
  unaware of the falsity of those representations."

---

[1] This abandoned claim was that PDA's insurance policy itself was a fraudulent misrepresentation.  The principal opinion's suggestion that Downard defrauded DIFP is something *that Plaintiffs did not allege*.  The Petition *never* alluded to this in any of its 26 pages/115 paragraphs, let alone in terms of fraud, which Rule 55.15 requires to be alleged "with particularity."

- "That the State of Missouri and Secretary of State Matt Blunt relied on those representations as being true …."
- "That the State of Missouri and Secretary of State Matt Blunt had a right to rely on those statements."

Plaintiffs thus sought to recover some $14 million "as a consequence of the State of Missouri and Secretary of State Matt Blunt's reliance on said statements …."

I do not see how these allege a fraud *upon Plaintiffs*, especially since Plaintiffs did not and do not now claim that *they* relied on Downard's statements. Cases cited by Plaintiffs and the principal opinion are distinguishable and not persuasive.

I acknowledge that some third parties can claim fraud if they reasonably relied on a misrepresentation (*e.g.*, investors burned because a company gave its auditors false data). But Plaintiffs do not claim they relied, much less reasonably relied, on Downard's termination filing.

Plaintiffs cite no solid support for extending fraud liability. I cannot find such authority either and am reluctant to make new law, so I would affirm the judgment against Plaintiffs on Count I.[2] Since Plaintiffs cannot win punitive damages if they lose on actual damages, I would also affirm the judgment against them on Count XI.

I would affirm the judgment in its entirety.

DANIEL E. SCOTT — SEPARATE OPINION AUTHOR

---

[2] To be clear, I do not think PDA's "termination" was effective against Plaintiffs; that the State lacked a remedy; or that false paperwork could be filed with impunity. But it may open Pandora's Box to say that persons can sue for misrepresentations that they did not hear, or see, or receive, or rely upon.

2